**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -**

**COREY LYONS,**

        **Plaintiff,**

    **v.**                        **7:13-CV-00614**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**


        **Defendant.**
**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -**

**THOMAS J. McAVOY**
**Senior United States District Judge**

## DECISION and ORDER

### I.    INTRODUCTION

On May 29, 2013, Plaintiff Corey Lyons ("Plaintiff" or "Lyons") commenced this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) of the Social Security Act ("Act") to review a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying Plaintiff's applications for Title II disability and supplemental security benefits and Title XVI supplemental security income. (Dkt. No. 1). Plaintiff contends that the decision of the Administrative Law Judge ("ALJ") denying his applications is not supported by substantial evidence and is contrary to the applicable legal standards. Pl. MOL (dkt. No. 14). The Commissioner argues to the contrary. Df. MOL (dkt. No. 15). For the following reasons, the matter is remanded for further proceedings.

## II.    BACKGROUND

The parties do not dispute the underlying facts/procedural history of this case.  The Court assumes familiarity with these facts and will set forth only those facts material to the issues discussed below.

### A. Individualized Education Program 2003-2004 (Massena Central School)

During the 2003-2004 academic year, Lyons was a senior at Massena Central School in Massena, New York; he turned 20 shortly before graduating with an Individualized Education Program ("IEP") diploma.  (T. 233).[1]  At that time, Lyons was participating in a community-based work program through the Board of Cooperative Educational Services (BOCES) and Vocational and Educational Services for Individuals with Disabilities.  (T. 234) Additionally, Lyons was attending a Multioccupations[2] class through BOCES. (T. 234). Lyons was also taking Business Math in a 12:1:1 setting. (T. 234).

The IEP mandated a number of specific modifications in both a testing and classroom setting. (T. 234-235).  In testing situations, Lyons needed extended time, a small group setting, and to have directions, test passages, questions, and multiple choice responses read to him. (T. 234).  In a class setting, he was given a copy of class notes and, in some cases, an enlarged copy of class materials. (T. 234, 235).  Lyons also had to have a program with "hands on activities and reinforcement of skills learned in a small group setting." (T. 235).  Lengthy material was to be read and explained to him during class, and

---

[1] Citations identified as "T" refer to the Administrative Transcript (Dkt. No. 10).

[2] Multioccupations is a program offered by St. Lawrence-Lewis BOCES which uses hands-on learning and traditional lecture formats to introduce students to a variety of career opportunities. It is intended to serve as an introduction to various occupational programs within BOCES. http://www.sllboces.org/Page/1265 (last visited Sep 25, 2014).

he needed to use a calculator and a computer in both class and exam settings. (T. 234, 235). The IEP specifically noted that Lyons was unable to participate in any regular education classes, and he was exempted from the foreign language requirement. (T. 233-234). He was described as needing a structured learning environment where skills and directions were clearly and verbally explained. (T. 235). At that time, Lyons was working at the P&C Food Store, apparently through the school. (T. 235). He hoped to find competitive employment after graduation. (T. 235).

## B. Psychological Evaluation by Robert Higgins (May 2004)

In early May 2004, at the request of the Committee on Special Education (CSE), Lyons was evaluated by school psychologist Robert Higgins. (T. 252-263). Higgins[3] summarized a history of significant developmental delays stretching back to 1988, when Lyons was four years old. (T. 252-253). Lyons did not start kindergarten until the age of six; even so, as a first grader who was nearly eight years old he was noted to be having "great difficulty with the first grade curriculum." (T. 253). By 1997, testing revealed that his language skills were some years behind his chronological age. (T. 253). At least as early as the 1996-1997 academic year, Lyons was classified as Other Health Impaired (OHI) and was placed in a 12:1:1 setting. (T. 253). He was returned to a mainstream setting with "significant Resource Room assistance" the following year, although he was still classified as OHI (T. 253). In Fall 1999, however, he was re-classified as OHI and Learning Disabled (LD) and returned to the 12:1:1 setting; at that time, he also began to participate in the Community Based Work Program. (T. 253). He was re-classified as LD only in the

---

[3]Higgins refers to himself in his reports as "Robert Higgins, School Psychologist." There is no mention of a Ph. D. so the Court will refer to him simply by last name.

2000-2001 school year, and in 2001-2002 he began to attend a Multioccupations class in a 12:1:1 setting. (T 253, 261 ).  Throughout the remainder of his school career,  Lyons participated in some combination of work programs and occupational education, all of which were in a 12:1:1 setting. (T. 253).

The school psychologist also administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) to Lyons. (T. 258-259).  In particular, he noted that Lyons had a full-scale IQ of 75, which fell in the borderline range and placed him in the fifth percentile. (258).  While there was some variation on the subtests, Lyons's performance on all subtests fell within the borderline range. (258-259).   In particular, his Working Memory Index score fell in the third percentile. (259).   Higgins noted that Lyons was likely to have problems "holding information to perform a specific task" and that he was likely to make "more frequent errors on a variety of learning tasks" than other adults his age. (259).  Finally, the school psychologist administered the Wechsler Individual Achievement Test, Second Edition (WIAT-II). (254, 259-261).  He noted that Lyons's actual results in many areas of this test were lower than would be predicted for an individual of his cognitive abilities; for example, his Word Reading and Reading Comprehension scores placed him in the lowest 0.4. and 0.5 percent of individuals his age. (260).   Higgins characterized these results as "significant and highly unusual." (260-261).  In extrapolating from these results, he said that Lyons would need hands-on instruction at work and would also need reminders until he mastered his tasks. (262).  He would be handicapped in jobs requiring reading and writing, and he would learn best in "structured learning situations with skills and directions taught directly and verbally." (262).

4

### D. Consultative Evaluation by Jeanne Shapiro, Ph.D. (May 2010)

On May 27, 2010, at the request of the Social Security Administration (SSA), Lyons was evaluated by psychologist Jeanne Shapiro, Ph.D. (T. 264-273). Dr. Shapiro carried out a mental status examination and also administered the Wechsler Adult Intelligence Scale-IV (WAIS-IV). (T. 269-270). The test yielded a Full Scale IQ of 65, a Verbal Comprehension score of 72, Perceptual Reasoning and Working Memory scores of 69, and a Processing Speed score of 71. (T. 270). Dr. Shapiro characterized these results as "valid" and said that Lyons was functioning in the mild range of mental retardation.[4] (T. 270). Additionally, she administered the Reading subtest from the WRAT-III, which showed that Lyons was reading at the third grade level. Dr. Shapiro noted that Lyons appeared incapable of reading, writing, or performing arithmetic at an age-appropriate level. (T. 272). She characterized Lyons as "capable of learning some rote tasks" but noted that, "taking into consideration the claimant's level of intellectual functioning," he would probably need vocational training and job coaching. (T. 272-273). She also opined that Lyons' cognitive deficits would also prevent him from handling money. (T. 273).

### E. Physical Examination by Roberto Rivera (May 2010)

On May 27, 2010, Lyons was evaluated by Roberto Rivera, M.D., at the request of the SSA. (T. 274-278). Lyons told the doctor that his left shoulder had been injured about a year previously when he was changing a tire at work, and that it had been painful ever since then. (T. 274). However, because he claimed that he could not afford medical care, Lyons

---

[4]The Social Security Administration (SSA) is replacing the term "mental retardation" with "intellectual disability." http: //www.gpo.gov/fdsys/pkg/FR-2013-08-0l/html/2013-18552.htm. Because the ALJ used the older term, the Court will also.

had not had his shoulder examined or treated. (T. 274).   Dr. Rivera examined Lyons and noted a decreased range of motion in his left shoulder, although an X-ray was negative. (T. 276).  The doctor advised further imaging studies, as he did not believe that an X-ray would be of much diagnostic help.[5]  (T. 274, 276).  Based on the objective results of his examination, Dr. Rivera found that Mr. Lyons had moderate to marked limitations for lifting, carrying, and overhead reaching with his left arm.  (T. 276-277).

### F.  Physical Therapy (August-September 2010)

On August 3, 2010,  Lyons was evaluated by physical therapist Eileen Fregoe. (T. 322).   Lyons explained that he had experienced pain in his left shoulder for approximately two years, and that it had started while he was changing a tire. (T. 322). He had been unable to seek medical care because he did not have insurance at that time, and the pain had worsened over the last two years. (T. 322).  At the time of the evaluation, Lyons rated the pain as six on a scale of ten when he was resting and ten out of ten when he was active. (T. 322).  In particular, he had difficulty lifting, raising his hand overhead, and performing repetitive motion. (T. 322).  He was also unable to lie on his left side. (T. 322).

Objective testing suggested involvement of the supraspinatus muscle or tendon. (T. 322).  Ms. Fregoe also noted that Mr. Lyons had limited strength and range of motion in his left shoulder and that his pain increased with overhead motion. (T. 322).  In addition to the limited range of motion, Ms. Fregoe observed impaired scapular stability and a palpably inflamed supraspinatus in the left shoulder. (T. 322, 327).  Short-term goals for physical therapy were defined as increasing range of motion and scapular stability of the left

---

[5]A July 21, 2010 MRI of  Lyon's left shoulder revealed tendinosis with a small effusion, and a small amount of fluid that suggested bursitis. (324).

shoulder to within normal limits, as well as increasing shoulder strength and eliminating pain. (T. 327). Long-term goals included reaching the maximum level of functioning in lifting and daily activities and being able to sleep on his left side. (T. 327).

On the day of his evaluation, Lyons was treated with hot packs, electrical stimulation, and therapeutic exercise. (T. 329). He returned for treatment on August 5, 10, 12, and 16, 2010, and was given a series of home exercises. (T. 330, 337). By August 24, 2010, Lyons was able to use his left arm but still experienced pain when doing so. (T. 338). He was unable to exercise from August 26, 2010 through September 9, 2010 due to appendicitis, but continued to receive other treatments. (T. 340-342). On September 10, 2010, Lyons was successfully discharged from physical therapy. (T. 343).

### G. Adult Function Report (March 2010)

On March 18, 2010, Kim Halpin of the Disabled Clients Assistance Program (DCAP) unit at the St. Lawrence County Department of Social Services helped Lyons complete an Adult Function Report. (T. 188-195, 197). At that time, Lyons was living with a cousin in Norfolk, New York. (T. 188). He cared for a cat and a dog with his cousin's help; and he needed help performing laundry and housecleaning chores. (T. 189, 191). His cousin also did most of the cooking, although Lyons cooked "occasionally." (T. 190). While Lyons did shop, he did so with his cousin; he was unable to pay bills, handle a checking account, or use a checkbook or money orders, and could count change, but "not well." (T. 192).

Lyons contends he has limited use of his hands, and difficulty pushing and pulling. (T. 193). He also contends he has difficulty with attending to and with finishing what he started, and he can only follow "simple" instructions. (T. 194). He also notes that he has trouble remembering things, which he attributes to a poor short term memory. (T. 195).

7

### H. Non-Examining Medical Consultant (Mental) (June 2010)

On June 3, 2010, medical consultant M. Marks[6] reviewed Lyons's file up to that point. Marks concluded that Lyons' history is "more consistent with Borderline Intellectual Functioning" than mental retardation, and that Lyons "retains the capacity to understand and follow simple directions, sustain a reasonable pace, relate and respond adequately in a social setting, and adapt to change." (T. 279-299).

### I. Hearing Testimony of Corey Lyons (August 2010)

Lyons was the only witness at the hearing held on August 30, 2011. (T. 39-66). Plaintiff was born in June 1984. He was therefore 27 years old at the time of his hearing. In response to the ALJ' s questions, Lyons said he had been in a 12:1:1 classroom through most of his school career and that he had graduated with an IEP diploma. (T. 44-45). His left shoulder was painful both when he was working and when he was not working, including "just sitting here right now, talking to you." (T. 47-48). In particular, repetitive motion such as the weed whacking at his then-current workfare[7] assignment made his shoulder hurt. (T. 56). The pain lasted through the rest of the day, but he persevered because he had no other source of income. (T. 56).

Lyons was then performing workfare at a local cemetery, but he had previously worked full-time in customer service at P&C, as an inserter at a newspaper company, and as a maintenance person at a high school. (T. 45-47). He had job coaches at all of these

---

[6]Marks refers to himself in his report as "Marks, M., Psychology," but does not indicate whether he holds a Ph. D or some other advanced medical degree. The Court will, therefore, refer to him by his last name only.

[7]"Workfare" is the common name for "work activities" which public assistance recipients must perform as a condition of receiving benefits. The only exemptions are for the elderly, for those still in school, and for those who are ill or disabled. New York Social Services Law §331 *et seq.;* 42 U.S.C. §601 *et seq.*

jobs; however, he lost his job at the paper company because he forgot his schedule, and lost his job at the high school because others had told his supervisor he was not doing his job properly. (T. 46-47, 54). Lyons said he needed the help of his job coach to focus on his duties at P&C, and he had difficulty remembering what he was supposed to be doing at the high school. (T. 56-57). He had been reprimanded at both the paper company and at the high school for not keeping up with the required pace, and he was having some difficulty keeping up with the others on his workfare detail. (T. 58-59, 63). Lyons had one job without a job coach, but that had lasted only two weeks. (T. 54-55). Although he said he tried his best, Lyons was unable to read or comprehend. (T. 50). This prevented him from learning tasks through written instructions. (T. 51).

Lyons had been able to get a driver's permit only because a DMV employee had read the test to him and simplified some of the questions, although he was unable to pass the driver's test. (T. 64). He was unable to read labels or recipes on food products and had to have someone go shopping with him for help. (T. 59-60). He tried to read recipes, but he would have someone available to simplify the recipes for him if necessary. (T. 60). While Lyons was able to count change, it took him some time, and he always asked someone to check his totals for him. (T. 61). He was unable to write checks; while he had opened a checking account once, he had never used it. (T. 62- 63).

Lyons also contended that he experienced problems with concentration on a daily basis. (T. 50, 61 ). He claimed he could not read for more than a few minutes, and he could not attend to an entire movie or TV show. (T. 50, 61). However, he attributed this at least in part to the pain in his shoulder. (T. 61).

## III.   THE ALJ'S DECISION

The ALJ first addressed whether Plaintiff met the insured status requirements, finding that Plaintiff's earnings record provided for coverage through June 30, 2007.  (T. 20.); *see Kohler v. Astrue,* 546 F.3d 260, 265 (2d Cir. 2008)(An individual must demonstrate the onset of disability on or before his date last insured in order to qualify for Social Security disability benefits. ).  The ALJ then made the following findings with regard to the period from Plaintiff's alleged onset date of August 15, 2005 through the date of the ALJ's decision:

> 1. The claimant had not engaged in substantial gainful activity ('SGA") since August 15, 2005.
>
> 2. The claimant has the following determinable severe impairments: borderline intellectual functioning and left shoulder tendinosis/bursitis.
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of listed impairment.[8]
>
> 4. The claimant has the residual functional capacity ("RFC") to perform light work involving simple one or two step tasks that do no require complex decision making, supervising others, or working on an assembly line.  *Id.* at 24.[9]
>
> 5. Claimant is unable to perform any past relevant work. [10]

---

[8] The ALJ concluded that Plaintiff did not meet the complete requirements of any of the Listings, including Listing 1.00B2c. T. at 23. Plaintiff does not address the ALJ's determination on Listing 1.00B2c, but only challenges the determination for Listing 12.05. (Dkt. Nos. 14, 18).

[9] Under C.F.R. §§ 404.1567(b) and 416.967(b), a claimant's purely physical abilities (or "exertional level") may fall into one of five categories, to wit: Sedentary Work; Light Work; Medium Work; Heavy Work; and Very Heavy Work.  "Light Work" involves lifting no more than 20 pounds *occasionally* (activity that exists up to 1/3 of the time) or 10 pounds *frequently* (activity that exists 1/3-2/3 of the time), and may require walking or standing a lot; even when it requires sitting, it may include pushing and/or pulling with arms or legs and if an individual is determined to be able to do "Light Work," he or she can most of the jobs requiring "sedentary work." 20 C.F.R. §§ 404.1567(b), 416.967(b); Social Security Ruling (SSR) 83-10.

[10] Examples of past jobs held by Plaintiff which he would be unable to perform with his current limitations include: Bagger and customer service provider at Fancy Foods (grocery store), Inserter at
(continued...)

6. Considering claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform.

7. Claimant has not been under a disability, as defined in the SSA from the alleged onset date (August 15, 2015), through the date of the ALJ's decision.

## IV.    DISCUSSION

Plaintiff argues that (1) The ALJ erred by failing to find Plaintiff's combined severe impairments equal a listed impairment. (Dkt. No. 14 at 12–18.[11]); (2) The ALJ improperly assessed Plaintiff's RFC. (*Id.* at 18–21);[12] and (3) The ALJ erred in relying on the Grids. (*Id.* at 21-23).[13]  Defendant contends that the ALJ's decision applied the correct legal standards, is supported by substantial evidence and, thus, should be affirmed. (Dkt. No. 14.)  The Court finds that there are gaps in the record rasing a question as to whether the ALJ applied the correct standard in determining whether Plaintiff's combined severe impairments equal a listed impairment.  Therefore, the matter must be remanded for further determination. Because this implicates a Step 3 determination, the Court refrains from addressing

---

[10](...continued)
Johnsons Paper Company, Maintenance at Massena High School. T. at 46-47, 54-59.  Here, the ALJ gave Plaintiff the benefit of the doubt in determining that Plaintiff would be unable to perform past work, not because he was unable to perform the requirements, but, because the lifting requirements of these jobs were not contained within the record. T. at 26.

[11] Specifically, Plaintiff contends that his impairments are sufficient to meet the Listing 12.05C or 12.05D; that "Mr. Lyons meets each and every prong of this Listing and is thus disabled as a matter of law. Dkt. No. 14 at Points III-IV.

[12] Plaintiff challenges the ALJ's RFC assessment as inadequate, specifically because the ALJ did not employ a vocational expert nor a functional-by-function analysis to explain the reasoning behind her stated limitations (i.e. Plaintiff could engage in Light work, but not work on an assembly line.) Dkt. No. 14 at Point V. Also, Plaintiff asserts that the ALJ's credibility determination of Plaintiff's testimony at the SSA hearing was flawed. *Id.* at Point VI.

[13] Plaintiff argues that the ALJ erred in applying the Grids because, among other things, Plaintiff's non-exertional limitations (mental handicaps, such as his literacy difficulties) need be addressed by a vocational expert in order to determine the affect on his ability to work. Dkt. Nos. 14 at Point VII and 18 at 9-10.

Plaintiff's challenges to the ALJ's determinations at subsequent steps in the sequential

evaluation.

### a. The ALJ Erred in Evaluating Whether Plaintiff Met the Requirements of Listing 12.05

Impairments listed in Appendix I of the regulations are "acknowledged by the

[Commissioner] to be of sufficient severity to preclude" substantial gainful activity; therefore,

a claimant who meets or equals a Listing is "conclusively presumed to be disabled and

entitled to benefits." *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir.1995); *see* 20 C.F.R. §§

404.1520(a)(4)(iii), 416.920(a)(4)(iii) ("If you have an impairment(s) that meets or equals

one of our listings in appendix 1 of this subpart and meets the duration requirement, we will

find that you are disabled.").  Listing 12.05 provides in pertinent part:

> **12.05  Mental Retardation**: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied.
> ...
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> or
>
> D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

12

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

To meet Listing 12.05, a claimant must satisfy the introductory paragraph, sometimes called the diagnostic description or a capsule definition, in addition to the criteria in one of the subparagraphs. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A) ("If your impairment satisfied the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets [Listing 12.05]."). "Thus, to meet Listing 12.05(C) Plaintiff must show (1) below average intellectual function with adaptive functioning deficits manifested before age 22 and continuing during the claim period, (2) a valid IQ score of 60 through 70, and (3) an impairment, other than [his] low IQ, that imposes 'an additional and significant work-related limitation of functioning.'" *Decarlo v. Astrue*, 2009 WL 1707482, at *4 (N.D.N.Y. June 17, 2009)(Rep. Rec. adopted by Dist. Ct.)(quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05(C)). To meet Listing 12.05(D), Plaintiff must show (1) below average intellectual function with adaptive functioning deficits manifested before age 22 and continuing during the claim period, (2) a valid IQ score of 60 through 70, and (3) two of the following: Marked restriction of activities of daily living; Marked difficulties in maintaining social functioning; Marked difficulties in maintaining concentration, persistence,

13

or pace; or Repeated episodes of decompensation, each of extended duration.

### 1. ALJ's Determination regarding Listing § 12.05

The ALJ's Step Three determination was as follows:

In determining whether the claimant's left shoulder tendinosis/bursitis meets or equals a listing, I have taken into consideration the requirements of I.00B2c. Since the claimant's impairment effects only one of his upper extremities, it does not result in inability to perform fine and gross movements effectively as defined in I.00B2c. Therefore, his impairment does not meet a listing.

The claimant's mental impairment has been considered under the requirements of listing 12.05. Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

At the hearing, the claimant's representative asserted that the claimant meets or equals the requirements of 12.05C or 12.05D and requested that the record be left open for submission of a post-hearing brief. I have reviewed and considered the argument made by counsel in her brief, but I find that her argument is not consistent with the totality of evidence. As noted above, to meet the requirements of Listing 12.05, the claimant must prove significantly subaverage general intellectual functioning with deficits in adaptive functioning prior to attaining age 22. Here, the representative correctly notes that in May 2010, at age 25, intelligence testing revealed a Full Scale IQ of 65 (Exhibit IIF, 2F). Additionally, she argues that the claimant had significant difficulty at his recent custodial job (Exhibit IIF, p. 1). She cites examples such as the claimant having difficulty keeping up with the pace of the work and requiring assistance of his coworkers to complete tasks (Exhibit I IF, p. 1). The representative also referenced the claimant's testimony at the hearing, where he explained his difficulties with activities of daily living such as grocery shopping, cooking, and paying bills (Exhibit IIF, p. 1).

Although the claimant's recent IQ test shows that the claimant's impairment causes some problems with intellectual functioning, based on the claimant's testimony and the medical record as a whole, I find that there is minimal evidence of deficits in adaptive functioning as he retains the ability to perform simple tasks with the additional restrictions described below. Additionally, the record shows that prior to attaining age 22, despite some limitations, he was able to function successfully at school and secure employment following his high school graduation. For example,

14

according to the claimant's IEP for the academic year 2003 to 2004, the claimant required small group instruction secondary to limited academic skills (Exhibit 8E, p. 2). However, with academic assistance, the claimant was highly successful in his classes (Exhibit 8E, p. 2). He received Business Math instruction in a 12:1:1 setting, and was "at the top of his class" (Exhibit 8E, p. 2). The IEP further indicates that the claimant was able to work well in any learning environment if directions were given verbally (Exhibit 8E, p. 2). Additionally, it noted that he worked well with hands-on tasks, independently or in a group, and was an "excellent" worker (Exhibit 8E, p. 2). Consistent with the IEP report, intelligence testing from 2004, at age 19 and 11 months, showed the claimant was functioning at a higher level than demonstrated by the recent May 2010 test (Exhibit IF, p. 4). The 2004 intelligence test showed a Verbal IQ of 76, a Performance IQ of 78, and a Full Scale IQ of 75 (Exhibit IF, p. 4). Although this placed the claimant in the "borderline" range of intelligence, it is not at listing level. Viewing the evidence in the totality, I find that although the record shows the claimant has had some difficulties with learning, but despite his limitations, he was highly functional and successful in an academic setting. Since the record is absent evidence of significantly subaverage intellectual functioning with deficits in adaptive functioning prior to age 22, I find that the claimant's borderline intellectual functioning does not meet a listing.

(T. 23-24).

### 2. Evidence of adaptive functioning deficits manifested before age 22 and continuing during the claim period

Plaintiff argues that the ALJ improperly determined that the record was "absent evidence of significantly sub-average intellectual functioning with deficits in adaptive functioning prior to age 22." (T. 23). The Court agrees.

In reaching her conclusion, the ALJ stated that "[a]lthough the claimant's recent IQ test shows that the claimant's impairment causes some problems with intellectual functioning, based on the claimant's testimony and the medical record as a whole, I find that there is minimal evidence of deficits in adaptive functioning as he retains the ability to perform simple tasks with the additional restrictions described below." Later in her Decision, the ALJ gave the "most weight to the State agency psychologist, Dr. Marks," but did not

15

indicate the weight given to Dr. Shapiro or explain why Dr. Shapiro's opinions were afforded less weight than Marks' opinions.  This is problematic on a number of fronts.

First, Marks, a non-examining medical consultant, refers to himself in his reports, including his Mental Residual Functional Capacity Assessment, as "Marks, M., Psychology" without any indication of whether he holds a Ph. D or other advanced medical or psychological degrees.[14]  Although an ALJ is entitled to rely upon the opinions of a state agency medical consultant because they are deemed to be experts in the field of Social Security disability, *see Nosbich v. Astrue,* 2012 WL 1029476, at *4 (W.D.N.Y. March 26, 2012), this Court has held that "the opinion of an examiner whose title or qualifications are not set forth on the RFC form is not entitled to any weight." *Bennett v. Astrue*, 2009 WL 1035106, at * 11 (N.D.N.Y. April 17, 2009)(citing *Dejesus v. Barnhart*,  2007 WL 528895, at *7 (W.D.N.Y. 2007)).   The absence of some indication in the record of Marks' education and training represents a gap in the record supporting the significant weight that the ALJ gave to Marks' opinions.

Second, this Court has also held that "a non-examining source's opinion, including the opinions of state agency medical consultants and medical experts, will be given less weight than an examining source's opinion. . . .   The general rule is that 'the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.'" *Id.* (quoting *Vargas v. Sullivan*,  898 F.2d 293, 295–296 (2d Cir. 1990) and citing *Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir.1986) (concluding that

---

[14]Plaintiff contends that it is not clear from the record whether Marks is an acceptable medical source within the meaning of 20 C.F.R. §§404.1513(a), 416.913(a). The Court does not reach this issue.

the opinions of non-examining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians)). The ALJ's decision to credit Mark's opinions over Dr. Shapiro's opinions requires further elaboration.

Third, Marks' opinions were cursory at best and based solely on his review of Lyons' file. Despite Dr. Shapiro's finding of a Full Scale IQ of 65 (which is in the mental retardation range), Marks notes only that the 2004 testing was in the Borderline range and opines that because the 2004 testing was "done after age 16, . . . we [really] didn't need the current testing." (T. 279). He further opines that a "[r]eview of [Lyons'] ADLS and history suggest functioning is more consistent with the Borderline Intellectual Functioning than the MR, so he does not meet the MR listing. Forms complete to reveal clt able to complete simple tasks." (T. 279). While Marks does give a slightly more expansive Functional Capacity Assessment where he notes that Dr. Shapiro had diagnosed Lyons with "Mild MR," Marks' assessment provides little upon which to conclude that Lyons should be deemed to be of Borderline Intellectual Functioning as opposed to having Mild Mental Retardation. (T. 297). Indeed, the facts upon which Marks reaches this conclusion appear to be somewhat similar to the facts that caused Dr. Shapiro to conclude that Lyons should be diagnosed with mild mental retardation, albeit absent some facts that could be deemed important if not crucial to a proper assessment of the opinion. For instance, Marks opines that Lyons was "markedly" limited in the ability to remember, understand, and carry out detailed instructions; "moderately" limited in the abilities to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, and to respond appropriately to changes in the work setting; and "moderately" limited in the abilities to

17

complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods. (T. 296). In explaining these determinations, Marks cites the 2004 school psychologist's report that Lyons could be trained for competitive employment although he would "require some additional training in order to master work tasks." (T. 297). However, Marks did not mention the school psychologist's opinion that Lyons would need hands-on instruction and reminders while learning a skill. (T. 262, 297). Further, while Marks cites Dr. Shapiro's opinion that Lyons could perform some rote tasks with appropriate training, he does not mention Dr. Shapiro's opinion that this would require vocational training and a job coach. (T. 273, 297). Marks' opinion also does not mention Dr. Shapiro's belief that Lyons could not read, write, or perform arithmetic at an age appropriate level and that he was incapable of managing money. (T. 272, 273, 297). The Court finds that there exists a gap in the record supporting the ALJ's decision to afford Marks' opinions the "most" weight, especially in light of the fact that Dr. Shapiro examined Lyons and administered an IQ test to him.

Fourth, while Marks opines that Lyons' functioning was "more consistent with the Borderline Intellectual Functioning" than with mild mental retardation, he described Lyons on the PRT form as having medically determinable "mild MR" based on "pertinent symptoms, signs, and laboratory findings that substantiate the presence of this impairment." (T. 285). Although Marks appears to differentiate Listing level mild mental retardation from medically determinable mild mental retardation, the failure of the ALJ to reconcile these two conclusions represents another gap in the record.

18

Also, in addressing adaptive functioning the ALJ noted that Lyons had graduated with an IEP diploma and that he had been at the top of his Business Math class. However, participation in special education classes and graduating with an IEP diploma does not, necessarily, constitute circumstantial evidence supporting adaptive functioning before the age of 22. Rather, attendance in special education classes and an education pursuant to an IEP have been construed as factors indicative of deficits in adaptive functioning. *See DeCarlo v. Astrue*, 2009 WL 1707482, at *6 (N.D.N.Y. June 17, 2009) (attending special education classes and graduating with an IEP diploma supported finding that plaintiff had adaptive deficits before age 22); *MacMillan v. Astrue*, 2009 WL 4807311 at *6 (N.D.N.Y. Dec. 7, 2009) (attending special education, graduating with an IEP, and needing assistance and reminders in a school setting supported finding that plaintiff had adaptive deficits before age 22) (citations omitted). The fact that Lyons graduated after his long history of special education, or even that he did well in a class in which he was provided numerous educational and adaptive accommodations, does not mean, *a fortiori*, that he lacked deficits in adaptive functioning before the age of 22. This is especially so because other indicators of substantial deficits in functioning (such as Lyons' substantial difficulty with reading, following instructions, performing mathematical calculations, or maintaining employment even with the aid of a job coach) could lead to the conclusion that Lyons did have requisite adaptive deficits to meet Listing 12.05. *See DeCarlo*, 2009 WL 1707482, at *5 (finding that the plaintiff had the requisite adaptive deficits to meet Listing 12.05 (C) becuase she "attended special education classes throughout her schooling ... graduated high school, but only with an IEP ... [had] substantial difficulties with arithmetic, such that she is unable to

pay her bills, handle money or count change ... ; [had] difficulty with reading comprehension, such that she [could not] read a cookbook or understand newspaper articles . .. and generally relie[d] on her mother to go shopping [and] drive places."); *see also id.* at *6 ("Courts have found circumstantial evidence, such as the following, sufficient to infer deficits in adaptive functioning prior to age 22: evidence a claimant attended special education classes; dropped out of school before graduation; or had difficulties in reading, writing, or math.")(citations omitted); *Kennerson v. Astrue*, 2012 WL 3204055, at *8-*12 (W.D.N.Y. 2012) (reversing ALJ's determination that plaintiff did not meet 12.05(C) criteria where plaintiff had been in a special education class throughout her school career and graduated with an IEP diploma but needed significant support to perform any work; had never held a job longer than six months; could do simple cooking but needed help measuring ingredients; needed assistance with grocery shopping; never had a bank account; and had difficulty counting change).

Furthermore, while the ALJ discussed Lyons' abilities to perform certain activities of daily living, she did not address the more expansive activities that comprise adaptive functioning. "The term 'adaptive functioning' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age. Indicators of adaptive behavior include … educational and social achievements." POMS DI 24515.056D2. Likewise, to qualify as mentally retarded under the DSM-IV-TR, deficits in only two of the following adaptive functioning skill areas are required: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

DSM-IV-TR at 41; *see also Barton v. Astrue*, 2009 WL 5067526, at *8 (N.D.N.Y. 2009) ("Since none of the methods endorsed by the major professional organizations require deficits in all areas of adaptive functioning or a complete lack of adaptive functioning, the term 'deficits in adaptive functioning' must allow for adaptive functioning in some areas, as long as deficits are present in other areas of functioning"). Lyons' testimony, together with his work record and the longitudinal evidence in his IEP, arguably demonstrates a long-standing inability to function academically or vocationally outside a highly structured setting. Moreover, according to his testimony he is unable to manage shopping, cooking, or personal finances independently, as would an unimpaired individual of the same age. It is unclear whether the ALJ considered all of these limitations together when determining that Lyons does not exhibit Listing level deficits in adaptive functioning. Thus, the Court finds that the matter must be remanded for a more thorough review of the evidence of Lyons' adaptive functioning before age 22.

### 3. **Valid IG score of 60 through 70**

Plaintiff also contends that the ALJ erred by failing to adequately explain why she credited the Higgin's 2004 IQ test over Dr. Shapiro's 2010 test. The Court agrees.

> Because § 12.05 refers to "valid" IQ scores, several courts have concluded that an ALJ may reject an IQ score as invalid when it is inconsistent with the record. *Lax v. Astrue*, 489 F.3d 1080, 1087 (10th Cir. 2007); *Markle v. Barnhart*, 324 F.3d 182, 186 (3d Cir. 2003); *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir.1991); *see also Clay v. Barnhart*, 417 F.3d 922, 929–31 (8th Cir. 2005) (upholding the ALJ's rejection of two sets of IQ scores where the test administrator considered the first set invalid and the report on the second set was sufficiently equivocal as to its validity to allow the ALJ to disregard its conclusions); *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986) (finding the ALJ's rejection of the Plaintiff's low IQ scores proper where the Plaintiff was close to completing a bachelor's degree and had taught high school algebra); *Vazquez ex rel. Jorge v. Barnhart*, 2005 WL 2429488, at *8 (S.D.N.Y. Sept. 30,

2005) ("As Jorge has multiple IQ scores both below and above 70, it is for the ALJ to reconcile these scores."); *Vasquez–Ortiz v. Apfel*, 48 F.Supp.2d 250, 257 (W.D.N.Y. 1999) (stating that "an ALJ is not required to accept a claimant's IQ scores when they are inconsistent with the record" but finding the Plaintiff's scores were not inconsistent with the record).

*Salem v. Colvin*, 2014 WL 975696, at *5 (N.D.N.Y.  March 12, 2014).

The ALJ rejected the 2010 IQ test based on "the claimant's testimony[,] the medical record as a whole, . . . [Lyons'] ability to perform simple tasks with the additional restrictions described below[,] . . . [and because] the record shows that prior to attaining age 22, despite some limitations, he was able to function successfully at school and secure employment following his high school graduation."  However, Lyons' testimony was far from supportive of the conclusion that the 2004 IQ test was more representative of his functional ability than the 2010 IQ score.  Similarly, as discussed above, there are questions whether the "medical record as a whole" supports the conclusion that the 2004 IQ test provided the most "valid" score.  The same could be said for "[Lyons'] ability to perform simple tasks" and for his "[ability] to function successfully at school and secure employment following his high school graduation."   Crediting Lyons' testimony, as the ALJ did, Plaintiff had profound difficulties in performing simple tasks or maintaining employment without the help of a job coach.

Moreover,

the Listings themselves provide that "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 CFR § 404, Subpart P, App. 1 § 12.00D (6)(c). This has led some courts to conclude that it is not proper for the ALJ to choose among competing scores. *See Castillo v. Barnhart*, No. 00 CIV. 4343, 2002 WL 31255158, at *14 n. 6 (S.D.N.Y. Oct. 8, 2002) ("However, most courts assume that a valid IQ result in the numerical range satisfies the first prong of 12.05C, and no additional inquiry is appropriate."); *Coogan v. Astrue*, No. 08–1387, 2009 WL 512442, at *5 n.

22

1, *6 n. 2 (D.N.J. Feb. 27, 2009) (stating that an ALJ may not decide which of multiple IQ scores he prefers because the regulations only require one score in the range of 60 through 70); *Ray v. Chater*, 934 F. Supp. 347, 350 (N.D.Cal.1996) (inferring from the regulation's preference for the lowest score amongst the verbal, performance, and full scale scores, that the regulations prefer the lowest score amongst multiple tests).

*Salem*, 2014 WL 975696, at *5.

While "it is within the purview of an ALJ to reject an IQ score as invalid when it is inconsistent with the record," *Carpenter v. Commissioner of Social Security*, 2014 WL 859160 at *4 (N.D.N.Y. March 5, 2014)(interior qotation marks and citation omitted), here, for the reasons discussed above, the 2010 tests scores do not appear inconsistent with the record as a whole. Further, while the pertinent issue is Lyons' intellectual functioning before age 22, it is "reasonable to presume, in the absence of evidence indicating otherwise, that claimants will experience a fairly constant IQ throughout [their] li[ves]." *Talavera v. Astrue*, 697 F.3d 145, 152 (2d Cir. 2012)(interior quotation marks and citation omitted). Because there is no evidence providing a reason that Lyons' IQ would decrease after age 22, the 2010 test score presents as a "valid" score in the Wechsler series. Thus, applying 20 CFR § 404, Subpart P, App. 1 § 12.00D (6)(c), and absent evidence of its invalidity[15] or sufficient reason to reject it, the 2010 score would apply for Listing 12.05 purposes.

The ALJ's failure to more fully reconcile the IQ scores requires remand. *Salem,* 2014 WL 975696 at *6 (holding a remand necessary for the Court to conduct meaningful review where the ALJ failed to explain discrepancy between IQ tests); *Velez v. Astrue*, No. 11-CV-

---

[15]Plaintiff also argues that WAIS-III scores have been called into question as providing unduly inflated results. Because it does not appear that this issue was presented to the ALJ, and because the matter will be remanded, the Court refrains from addressing it.

881S, 2013 WL 321552 at *5 (W.D.N.Y. Jan. 28, 2013)(finding ALJ's determination that

claimant did not meet the first prong of 12.0C not based on substantial evidence).

### 4. An impairment, other than [his] low IQ, that imposes "an additional and significant work-related limitation of functioning"

The Second Circuit "has not yet ruled on what test should be utilized with respect to §

12.05(C) in determining whether a claimant's 'physical or other mental impairment,' other

than his low IQ imposes a significant work-related limitation." *Edwards v. Astrue*, No.

07–CV–898, 2010 WL 3701776, at *6 (N.D.N.Y. Sep't 16, 2010). "The district courts of the

Second Circuit have generally adopted the view of the First, Eighth, and Tenth Circuits to

the effect that 'a limitation other than low IQ is 'significant' if the claimant suffers from an

additional physical or other mental impairment that is 'severe' as that term is defined at step

two of the Commissioner's sequential analysis.'" *Salem*, 2014 WL 975696, at *5, n. 4

(citations omitted); *see Davis v. Astrue*, 2010 WL 2925357 at *6 (N.D.N.Y. 2010)(this Court

and the SSA have clarified that a "significant physical impairment" for purposes of Listing

12.05(C) is a "severe" impairment within the meaning of 20 C.F.R. §§404.1502(c) and

416.920(c)); *MacMillan*, 2009 WL 4807311 at *7;[16] *see also Baneky v. Apfel*, 997 F. Supp.

543, 546 (S.D.N.Y. 1998) ("This Court holds that the correct standard for determining

whether an "additional" impairment imposes a "significant" work-related limitation under

section 12.05(c) is the severity test ...").  At step two, the ALJ found that Lyons' left shoulder

---

[16]("The regulations now direct an ALJ to 'assess the degree of functional limitation the additional impairment[ ] imposes to determine if it significantly limits [the claimant's] physical or mental ability to do basic work activities, i.e., is a "severe" impairment[ ], as defined in §§ 404.1520(c) and 416.920(c).  Thus, the regulations indicate that the proper test for evaluating an impairment, other than low IQ, under Listing 12.05C is the same test used at step two of the sequential evaluation to determine whether an impairment is 'severe.'")(citations omitted).

tendonitis/bursitis was a severe impairment that caused "more than minimal limitations on his ability to work." (T. 22).   As such, this impairment imposes additional and significant limitation of function as required by 12.05(C).

## V.     CONCLUSION

For the reasons discussed above, the matter is remanded to the Commissioner for further proceedings to determine whether the Plaintiff has satisfied the requirements of Listing 12.05.  Because this decision implicates a Step 3 determination, the Court refrains from addressing Plaintiff's challenges to the ALJ's determinations at subsequent steps in the sequential evaluation.

**IT IS SO ORDERED.**

Dated: September 29, 2014

Thomas J. McAvoy
Senior, U.S. District Judge